THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| AB,[1] <br><br>                         Plaintiff, <br> v. <br><br> HRB Professional Resources LLC <br><br>   **Serve**: CT Corporation System <br>            120 South Central Avenue <br>            Clayton, Missouri 63105 <br><br>                         Defendant. | **Case No.** <br><br> **JURY TRIAL REQUESTED** |

**COMPLAINT**

1. Plaintiff AB states his causes of action against Defendant HRB Professional Resources LLC ("HRB" or "Defendant") as follows:

2. This is an action for disability discrimination, hostile work environment, failure to accommodate and for retaliation for having engaged in protected action. Plaintiff's claims of discrimination arise under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* (ADA) and under the Missouri Human Rights Acts.

3. Plaintiff is a former employee in Defendant's marketing department. After he disclosed a mental health disability for which he required treatment, management harassed and

---

[1] This case pertains to discrimination on the basis of Plaintiff's mental health disability. Because Plaintiff has an interest in keeping his private health information out of the public domain, he wishes to remain anonymous. Accordingly, counsel has identified him only as "AB" in these pleadings and has redacted all identifying information out of the supporting charges of discrimination and notices of right to sue. Plaintiff is also filing a Motion for Leave to proceed anonymously, noting that, as a result of the underlying administrative process, Defendant is already aware of the claim and can identify it using the charge numbers.

humiliated him on the basis of his disability, unfairly reprimanded him, threatened him with termination, failed to accommodate him, and ultimately terminated him.

4. Plaintiff seeks all available legal and equitable remedies for claims under the ADA and the MHRA including, back pay, front pay, compensatory damages, punitive damages, and attorneys' fees.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. § 1331, which provides original jurisdiction in this Court for suits arising under federal law.

6. This Court has jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367, which provides authority for a United States federal court to hear a closely related state law claim against a party already facing a federal claim.

7. This Court has jurisdiction over Plaintiff's claim because Plaintiff filed two timely Charges of Discrimination with the proper Agencies (Equal Employment Opportunity Commission ("EEOC") and Missouri Human Rights Commission("MCHR")) and received Right-to-Sue letters mailed, respectively, on July 10, 2019 and August 15, 2019, and received thereafter.

8. Venue is proper in the United States District Court for the Western District of Missouri under 28 U.S.C. § 1391(b)(2), because the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

9. Plaintiff AB was a resident of Kansas City, Missouri and is currently a resident of Illinois.

10. Defendant HRB Professional Resources, LLC is a foreign for-profit company organized in the state of Delaware and authorized to do business in Missouri. Defendant HRB is an employer within the meaning of the ADA and the MHRA.

## ADMINISTRATIVE PROCEEDINGS

11. On or about July 16, 2018, Plaintiff timely filed charge number 563-2018-02473 against H & R Block with the Missouri Human Rights Commission. The charge was dually filed with the EEOC. He later amended that charge on or about June 21, 2019 with the same charge number. A copy of that charge is attached as Exhibit A.

12. On or about July 10, 2019, the EEOC mailed a notice of right to sue pursuant to the ADA to Plaintiff and he received it thereafter. The MCHR mailed a notice of right to sue regarding this charge on or about July 30, 2019. A copy of the EEOC and MCHR Right to Sue Notices is attached as Exhibit B.

13. On or about July 17, 2019, Plaintiff timely filed EEOC charge 563-2019-02209 for disability discrimination, wrongful termination, and retaliation. A copy of that charge is attached as Exhibit C.

14. On or about August 15, 2019, the EEOC mailed a notice of right to sue pursuant to the ADA to Plaintiff and he received it thereafter. The MCHR mailed a notice of right to sue regarding this charge on or about August 29, 2019. A copy of the EEOC and MCHR Right to Sue Notices is attached as Exhibit D.

15. This action has been filed with this Court within 90 days of Plaintiff's receipt of the right-to-sue notices of from the EEOC. Plaintiff has fully complied with all administrative prerequisites before filing this action.

## FACTUAL BACKGROUND COMMON TO ALL COUNTS

16. Plaintiff began his career with Defendant on or about March 20, 2017. At the time of his termination, his job title was Lead Product Manager. He was originally hired to work in the Innovation business unit.

17. When he started his employment, during his first one-on-one session with his supervisor, Plaintiff requested a reasonable accommodation of a modified work and break schedule to enable him to attend psychotherapy sessions which he required to manage his mental health diagnosis.

18. Plaintiff's supervisor told him that as a full-time non-seasonal employee, he had flexibility in shifting his hours to accommodate his personal needs so long as he timely completed his work.

19. Plaintiff's supervisor did not direct him to contact Human Resources with his request for reasonable accommodation or to take any other action with regard to his request for accommodation.

20. In late April 2017, the Innovation Business unit (to which Plaintiff was assigned at that time) underwent a reorganization, and Plaintiff was reassigned to the Marketing Business unit. Alan Lowden, Chief Information Officer, encouraged him to interview for other positions within the company.

21. On or about May 11, 2017, Plaintiff met with Amy Hu, the Vice President of Marketing (Digital) about a position in her business unit. The conversation went well and Ms. Hu specifically told Plaintiff that his skill set would be a good fit for her team, and offered him an internal transfer to her team, which Plaintiff accepted.

22. At some point in the conversation, Ms. Hu offered Plaintiff the opportunity to lease a rental property she owned. Plaintiff declined the offer and Ms. Hu reacted aggressively

and pushed Plaintiff again to lease her property. At that point, Plaintiff told Ms. Hu that he had a mental health disability and explained that he needed to be in a different location to accommodate his regular psychotherapy appointments.

23. Ms. Hu became visibly discomfited at Plaintiff's mention of a mental health diagnosis and a need to undergo therapy, and Plaintiff reassured her that his disability had not interfered with his work performance, and he did not expect it to be a problem.

24. Ms. Hu responded with "Okay – as long as you promise me you won't forget to take your meds, as I don't want you going postal." Plaintiff was humiliated and upset by Ms. Hu's comment, but was nevertheless optimistic at that point about transferring to Ms. Hu's unit.

25. On or about May 15, 2017, Plaintiff met with George Guastello, Executive Vice President of Marketing, and Scott Buchbinder, Director of Finance about the possibility of an internal transfer to Ms. Hu's business unit. Both individuals agreed that Plaintiff's skill set would be a good fit for Ms. Hu's team and assured him that the internal transfer would be a smooth process and would not present any corporate or administrative hurdles.

26. On August 24, 2017, Plaintiff again met with Ms. Hu to talk about the logistics of the internal transfer she had offered. During the meeting, Plaintiff focused on what knowledge, skills, and abilities he could bring to the team. Ms. Hu, however, focused again on Plaintiff's mental health and asked him if he had experienced any trouble in the past navigating stress. Ms. Hu also expressed her concerns that because Plaintiff needed to see a psychiatrist, he was not mentally able to handle a high-stress position such as the one she had offered him. Once again, Plaintiff assured Ms. Hu that he was able to perform all the functions of his job well and that his mental health had never interfered with his job performance.

27. At some point in that conversation, Ms. Hu addressed the fact that Heather Watts, Senior Vice President, was considering Plaintiff for a role in the Digital DIY digital unit and asked Plaintiff if he would prefer to join Ms. Watts' team. Plaintiff told Ms. Hu that he preferred the role on her team over that of Ms. Watts. Once again, Ms. Hu specifically stated that she was concerned that Plaintiff's health would be a "liability for our team," and that she needed someone who could handle a high stress role. In her comments, Ms. Hu incorrectly identified Plaintiff's diagnosis as PTSD.

28. Once again, Plaintiff stressed that he was fully capable of performing in the role and that he had never had any behavioral issues in the past related to his mental health. Ms. Hu ended the meeting abruptly without responding to Plaintiff's repeated assurances that his health would not preclude him from being a successful team member for her.

29. On or about August 30, 2017, Plaintiff met with Zerlina Jackson, Director of Marketing (Digital) about joining the team. The conversation went well, and Ms. Jackson expressed enthusiasm for Plaintiff's experience and skill set.

30. However, during a conversation about how Plaintiff relaxed when he was not at work, Ms. Jackson specifically referenced his mental health and asked him whether he could handle a stressful position, because "Amy wants to know that [his] PTSD [wouldn't] be a liability." Once again, Plaintiff assured management that his condition had not interfered with his performance in the past. Plaintiff and Ms. Jackson agreed to meet to further discuss Plaintiff's ideas and potential contributions to the team.

31. Plaintiff sent Ms. Jackson a meeting request on or about September 5, 2017, but Ms. Jackson declined the meeting without explanation, and failed to respond to the follow-up

email Plaintiff sent inquiring about the meeting they had discussed. When Plaintiff saw Ms. Jackson in the elevator, she acted aloof and did not offer to meet with Plaintiff.

32. On or about September 7, 2017, Plaintiff met with Amy Hu. Ms. Hu expressed concern that Plaintiff would not be a good fit for her team because she would not have complete confidence in him. When Plaintiff pressed as to why she had "lost confidence," in him, Ms. Hu responded that the position would be stressful, and that because of Plaintiff's PTSD, she did not think he would be a good fit for the team. Plaintiff explained that he did not have PTSD, and, again reiterated that his mental health had not interfered with his work performance in the past, and that he had no reason to think his disability would present a problem.

33. During the September 7, 2017 meeting, Plaintiff specifically alleged that in rescinding her job offer to him, Ms. Hu was discriminating against Plaintiff on the basis of his disability. Ms. Hu reacted angrily, denied the allegations, and acknowledged Plaintiff's skill set, but suggested that there were better opportunities for him elsewhere. Ms. Hu also acknowledged that she "could've done a better job bringing this up," but said that if they were to work together, "this is how it is."

34. On or about October 30, 2017, Plaintiff had a one-on-one with John Hiller, the Director of Marketing, who was his immediate supervisor. During the meeting, Mr. Hiller informed Plaintiff that he had not been selected for the position on Heather Watts' team because he had done poorly in the interviews, and there was concern that he had "interpersonal" problems. Plaintiff was surprised, as he believed the interview had gone well, and pressed Mr. Hiller to speak directly with Ms. Watts about the matter. Mr. Hiller did so and reported that Ms. Watts had agreed that Plaintiff had interviewed well, but that she suggested that Plaintiff would be a better fit for another division.

35. Plaintiff was aware that Amy Hu had significant influence in the marketing department, and he expressed his concern that she invented "interpersonal problems" in retaliation for Plaintiff's allegations that she had discriminated against him on the basis of his disability. Mr. Hiller said that he did not want to get involved, but asked Plaintiff to share notes and emails substantiating Plaintiff's concerns with him.

36. On November 2, 2017, Mr. Hiller acknowledged receipt of Plaintiff's notes and suggested he would keep Plaintiff's allegations private between the two of them.

37. Plaintiff's shorthand notes specifically referenced the mischaracterization of his condition as PTSD and contained several other references management had made to his "PTSD."

38. On or about November 3, 2017, Plaintiff met with Mr. Hiller and specifically alleged that Amy Hu had discriminated against him on the basis of his disability and had blocked him from being on her team as a result of her discriminatory animus. Plaintiff urged Mr. Hiller to elevate the problem and seek an appropriate remedy.

39. On or about November 9, 2017, Mr. Hiller approached Plaintiff and asked him to sign a "Written Warning" about a corporate expense charged for a project Plaintiff had done. Plaintiff disagreed with the contents of the reprimand and reminded Mr. Hiller that he had repeatedly offered to pay the expense himself, but that Mr. Hiller had insisted that he not pay for the expense prior to submitting the expense report.

40. On or about November 17, 2017, Plaintiff asked Mr. Hiller for updates about the status of his discrimination complaint. Mr. Hiller told Plaintiff that there were a lot of moving pieces, and that he needed to be patient and "keep his head down." Mr. Hiller declined to contact the new company CEO to discuss the status of the discrimination complaint.

8

Case 4:19-cv-00817-HFS   Document 1   Filed 10/07/19   Page 8 of 16

41. On or about December 15, 2017, Mr. Hiller asked Plaintiff what other jobs he was considering and encouraged him to look outside of H & R Block at other opportunities.

42. On or about January 17, 2018, Plaintiff spoke with Zerlina Jackson, congratulated her on an award her team had received, and offered to share some data he had collected. Ms. Jackson interrupted him, and she told him "you'll never be a part of our team because you have no idea how things work around here -- so why don't you go home, take a handful of your crazy pills, and never wake up."

43. A fellow Lead Product Manager spoke with Plaintiff on or about January 19, 2018 and told him that his manager had told him that senior marketing leadership had commented that Plaintiff would never have a job in marketing again.

44. Plaintiff met with John Hiller again on or about January 26, 2018. Mr. Hiller told Plaintiff that "given everything that's happened," he was being pressured to resolve Plaintiff's complaint. Mr. Hiller refused to say who was pressuring him to resolve the situation with Plaintiff, but he said that he preferred that Plaintiff leave voluntarily rather than involuntarily. Mr. Hiller also offered to provide Plaintiff positive letters of recommendation and introductions to other companies in the area.

45. On January 30, 2018, as a result of the discrimination he experienced, Plaintiff became incapacitated. He emailed Mr. Hiller and explained that the illegal treatment he had experienced had caused him to be sick and unable to work.

46. On or about February 11, 2018, Plaintiff emailed the company Chief Ethics Officer to report Ms. Jackson's discriminatory comment. Plaintiff received a generic response the following day, and a non-generic response from Stacy Vobach on February 19, 2018.

47. Plaintiff's wife, who was monitoring Plaintiff's emails while he was on leave, responded, and asked if Plaintiff's response was an emergency, as his doctor had advised him to "unplug" while he was on disability leave.

48. Plaintiff has no record of Ms. Vobach responding to his wife's email.

49. From January 30, 2018 through May 4, 2018, Plaintiff was on approved short-term disability leave for a major depressive episode.

50. From May 21, 2018 through June 25, 2018, Plaintiff was on FMLA approved leave.

51. On or about June 17, 2018, Laura Klopatek from Defendant's Human Resources, provided Plaintiff with a form to request leave.

52. Plaintiff was unable to return to work on June 26, 2018, at the conclusion of his approved leave, so he requested additional leave. Defendant was initially unresponsive to Plaintiff's request, and later gave inconsistent guidance on the process for approving a request for temporary leave.

53. On or about June 29, 2019, Ms. Klopatek directed her staff to see that Plaintiff receive the proper paperwork for requesting extended leave.

54. Plaintiff did not hear from Defendant again until on or about August 12, 2018, when Plaintiff's spouse received forms related to Plaintiff's pending claims for leave. Initially, Plaintiff and his wife did not realize the forms they had received were incomplete.

55. Defendant responded on or about August 28, 2018, and requested a phone call the following day with Plaintiff's spouse to address the issue related to Plaintiff's leave. Plaintiff's wife responded that she was traveling and unavailable, but suggested Defendant speak with Plaintiff's then counsel. No one from Defendant's office contacted counsel.

10
Case 4:19-cv-00817-HFS   Document 1   Filed 10/07/19   Page 10 of 16

56. On or about September 14, 2018, Plaintiff's treating psychiatrist noted that the disability forms did not contain all the attachments they referenced.

57. Plaintiff sent an email on September 16, 2018, explaining the deficiency in the forms. Plaintiff also directed Defendant to include his attorney in all communications related to his pending leave request.

58. On September 17, 2018, Stacy Vobach from Defendant's Human Resources Office emailed Plaintiff on behalf of Defendant and provided the missing attachments. However, she removed Plaintiff's counsel from the email. Plaintiff responded and again requested that Defendant communicate with counsel and his wife.

59. On September 19, 2018, Plaintiff was admitted for in-patient treatment.

60. Plaintiff was terminated on September 21, 2018.

**COUNT I—DISABILITY DISCRIMINATION/ FAILURE TO ACCOMMODATE IN VIOLATION OF THE MISSOURI HUMAN RIGHTS ACT**

61. Plaintiff incorporates by reference all prior paragraphs as through fully set forth herein.

62. Plaintiff has a mental health diagnosis which constitutes a disability and substantially limits one or more of his major life activities within the meaning of the controlling statutes.

63. In addition, or in the alternative, at all relevant times, Defendant perceived or regarded Plaintiff as suffering from a disability which substantially limited one or more of his major life activities within the meaning of the controlling statutes.

64. Plaintiff is an otherwise qualified individual able to perform the essential functions his job with or without reasonable accommodations.

65. Defendant was aware of Plaintiff's condition.

66. Plaintiff requested a reasonable accommodation.

67. Defendant failed to engage in an interactive process with Plaintiff about his request, and Defendant failed to grant his request.

68. Upon learning of Plaintiff's covered disability and required accommodation, Defendant subjected Plaintiff to ongoing severe harassment on the basis of his disability, including making derogatory statements about his condition, withdrawing a job offer, and unfairly disciplining him.

69. Defendant's treatment of Plaintiff amounted to disability discrimination in violation of the Missouri Human Rights Act.

70. All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees acting within the course and scope of their employment, as set forth in this complaint.

71. As a direct and proximate result of the unlawful conduct of Defendant as described in this complaint, Plaintiff has suffered damages which include past and future lost wages and benefits; a detrimental job record; career damage and diminished career potential; pain and suffering; and emotional and mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

72. Defendant's conduct was intentional, malicious, and/or outrageous and evidenced an evil motive, complete indifference to or conscious disregard for the rights of Plaintiff and others similarly situated, thereby entitled Plaintiff to an award of punitive damages.

**WHEREFORE**, Plaintiff prays for judgment against Defendant on Count I of his Complaint, for a finding that he has been subjected to unlawful discrimination on the basis of his

disability for an award of back pay, including lost fringe benefits, bonuses, costs of living increases and other benefits including interest; for an award of front pay in a reasonable amount; for an award of compensatory and punitive damages; equitable relief including reinstatement where Plaintiff is not subjected to discriminatory conduct and/or other hostile, offensive or intimidating treatment; for his costs expended; for his reasonable attorneys' and expert' fees; and for such other and further relief the Court deems just and proper.

### COUNT II—HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE MISSOURI HUMAN RIGHTS ACT

73. Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

74. Plaintiff has a covered disability which substantially limits his major life activities.

75. In addition, or in the alternative, at all relevant times, Defendant perceived or regarded Plaintiff as suffering from a disability which substantially limited one or more of his major life activities within the meaning of the controlling statutes.

76. Plaintiff is an otherwise qualified individual able to perform the essential duties of his position with out without reasonable accommodation.

77. Defendant is aware of Plaintiff's condition.

78. Defendant harassed Plaintiff on the basis of his condition.

79. Defendant's harassment of Plaintiff either created an offensive, hostile, or intimidating work environment or had the purpose or effect of unreasonably interfering with an individual's work performance.

13

80. All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees acting within the course and scope of their employment, as set forth in this complaint.

81. As a direct and proximate result of the unlawful conduct of Defendant as described in this complaint, Plaintiff has suffered damages which include past and future lost wages and benefits; a detrimental job record; career damage and diminished career potential; pain and suffering; and emotional and mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

82. Defendant's conduct was intentional, malicious, and/or outrageous and evidenced an evil motive, complete indifference to or conscious disregard for the rights of Plaintiff and others similarly situated, thereby entitled Plaintiff to an award of punitive damages.

**WHEREFORE**, Plaintiff prays for judgment against Defendant on Count II of his Complaint, for a finding that Defendant subjected him to a hostile work environment, for an award of back pay, including lost fringe benefits, bonuses, costs of living increases and other benefits including interest; for an award of front pay in a reasonable amount; for an award of compensatory and punitive damages; equitable relief including reinstatement where Plaintiff is not subjected to discriminatory conduct and/or other hostile, offensive or intimidating treatment; for his costs expended; for his reasonable attorneys' and expert' fees; and for such other and further relief the Court deems just and proper.

### COUNT III—RETALIATION AND WRONGFUL DISCHARGE IN VIOLATION OF THE AMERICANS WITH DISABILITY ACT

83. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

84. Plaintiff's disclosure of his condition, his request for reasonable accommodation, and his reports of discriminatory treatment were all protected actions.

85. After and because of the actions identified in paragraph 83, Plaintiff was harassed and humiliated on the basis of his disability, lost opportunities for advancement within the company, was unfairly disciplined, was threatened with termination, and ultimately terminated.

86. Defendant also failed to meaningfully communicate with Plaintiff's designated representatives during Plaintiff's time of incapacitation which interfered with his rights under the ADA, and ultimately led to his termination.

87. Defendant unlawfully retaliated against Plaintiff for his protected activity. Defendant's conduct violated Plaintiff's rights under the ADA and was undertaken willfully and maliciously so as to support an award of punitive damages under the ADA.

WHEREFORE, Plaintiff asks that the Court enter judgment in his favor on Count III, finding that he has been subjected to unlawful retaliation and retaliation in violation of the ADA; for an award of back pay, including lost fringe benefits, bonuses, costs of living increases, and other benefits, including interest; for an award of front pay in a reasonable amount; for an award of compensatory damages, for his costs expended; for his reasonable attorneys' and expert's fees; and for such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff AB hereby requests a trial by jury on all claims in his Complaint that may properly be submitted to a jury.

Respectfully submitted,

**DUGAN SCHLOZMAN LLC**

/s/ *Mark V. Dugan*

Heather J. Schlozman, MO Bar # 43234
Mark V. Dugan, MO Bar # 39639
heather@duganschlozman.com
mark@duganschlozman.com
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
Telephone: (913) 322-3528
Facsimile: (913) 904-0213

**Counsel for Plaintiff**